IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHAWN HAMPTON, | : | CIVIL ACTION NO. 1:15-CV-898 |
| Plaintiff | : | (Chief Judge Conner) |
| v. | : | |
| JOHN E. WETZEL, *et al.*, | : | |
| Defendants | : | |

**MEMORANDUM**

Plaintiff Shawn Hampton ("Hampton"), an inmate currently confined at the Rockview State Correctional Institution in Bellefonte, Pennsylvania ("SCI-Rockview"), commenced this action on May 8, 2015 pursuant to 42 U.S.C. § 1983. (Doc. 1). Remaining defendants are Wetzel, Lewis, Glunt, Eby, Young, and Bernard and Koltay, physician assistants at SCI-Rockview.[1] Before the court is a motion (Doc. 40) for summary judgment pursuant to Federal Rule of Civil Procedure 56 by defendants Bernard and Koltay. For the reasons set forth below, the court will grant the motion.

I. **Legal Standard**

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality. See FED. R. CIV. P. 56(a). The

---

[1] By memorandum and order dated March 21, 2016, the court dismissed all claims against defendants Miller, Williams, Ellensberg, Moore, and Pringle. (Docs. 31, 32). The only remaining claim against defendants Bernard and Koltay is an Eighth Amendment inadequate medical care claim for discontinuing Hampton's pain medication. (Id.)

burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(a), (e). Only if this threshold is met may the cause of action proceed. Pappas, 331 F. Supp. 2d at 315.

## II. **Statement of Material Facts**

Hampton first presented to sick call with complaints of back pain on May 6, 2010. (Doc. 41 ¶ 4; Doc. 42-1 at 10; Doc. 44 ¶ 4). On examination, the medical provider noted that Hampton had full strength and found no non-anatomical tenderness. (Id.) The medical provider ordered an x-ray of the lumbar spine. (Id.) The x-ray revealed mild degenerative disc disease at the lumbosacral joint. (Id.)

On June 23, 2010, Hampton presented to sick call with complaints of left wrist pain after scooping oatmeal. (Doc. 41 ¶ 5; Doc. 44 ¶ 5). He reported that the pain was exacerbated by dorsi-flexion exercises, and ibuprofen did not relieve his pain. (Id.) Examination revealed full range of motion and strength. (Id.) Physician assistant ("PA") Julie Pensiero treated Hampton and diagnosed him with left wrist pain and possible tendonitis and recommended that he continue taking non-steroidal anti-inflammatory medications ("NSAIDs"). (Id.) Hampton returned to sick call on July 12, 2010, again complaining of left wrist pain. (Id. at ¶ 6). During

2

this visit, Hampton again treated with PA Pensiero. (Id.) Hampton reported that his pain improved when he stopped the repetitive job of scooping and began wrapping his wrist with an ACE bandage. (Id.) An examination of Hampton's wrist revealed full range of motion and full strength. (Id.) PA Pensiero diagnosed left wrist pain with possible overuse syndrome and recommended that Hampton continue using the ACE wrap. (Id.)

On August 5, 2010, Hampton presented to sick call for an eye injury that was sustained as a result of being hit by a softball. (Doc. 41 ¶ 7; Doc. 44 ¶ 7). He was examined by nurse Brianne Gillmen, who found him in no acute distress, with a swollen right eye, some small abrasions, and normal vital signs. (Id.) Nurse Gillmen gave Hampton ice for his face and advised him to take Motrin for any pain and return if his vision worsened. (Id.)

On August 24, 2010, Hampton presented to sick call requesting a bottom bunk due to low back pain. (Doc. 41 ¶ 8; Doc. 44 ¶ 8). He denied a recent injury to his back. (Id.) He stated that the only prior injuries to his back occurred when he fell down a flight of stairs when he was ten years old and thirteen years old. (Id.) The parties dispute whether Hampton reported that he was taking Motrin for pain, which he purchased from the commissary. (Id.) PA Pensiero examined Hampton and noted that he was able to ambulate without difficulty, exhibited no muscle spasms, had full range of motion and strength, and was able to move without pain. (Id.) PA Pensiero found no indication for a bottom bunk. (Id.) PA Pensiero ordered Hampton a back brace and encouraged him to perform stretching and range of motion exercises. (See id.)

3

Hampton next complained of back pain on February 1, 2011, after a reported fall. (Doc. 41 ¶ 9; Doc. 44 ¶ 9). Nurse B. Dunlap treated Hampton, and noted that an examination was unremarkable and Hampton did not appear to be in distress. (Id.) Nurse Dunlap advised Hampton to rest and gave him Motrin for pain. (Id.) Shortly thereafter, on February 24, 2011, while on a hunger strike, Hampton was evaluated by Nurse Robert Somich. (Doc. 41 ¶ 10; Doc. 44 ¶ 10). Hampton told Nurse Somich: "All I want is bottom bunk." (Id.) He reported that he would eat once given a bottom bunk restriction. (Id.) Hampton was also seen by a PA, who reviewed his most recent x-ray and observed that it revealed only mild degenerative disc disease. (Id.) Therefore, the PA did not believe that a bottom bunk restriction was medically necessary. (Id.)

On September 4, 2013, Hampton submitted a sick call for a replacement back brace and treated with defendant Koltay. (Doc. 41 ¶ 11; Doc. 42-1 at 24; Doc. 44 ¶ 11). The parties dispute whether Hampton reported that the brace provided him with pain relief and that, with the brace, he had less need for NSAIDs. (Id.) After examination, Koltay ordered Hampton a new back brace. (Doc. 41 ¶ 11). She also instructed him on weight loss and exercise and told him to return as needed. (Id.)

On October 11, 2013, Hampton returned to sick call and was again seen by defendant Koltay. (Doc. 41 ¶ 12; Doc. 42-1 at 25; Doc. 44 ¶ 12). Hampton requested a clarification regarding his medical restrictions. (Id.) He reported that corrections officers told him that he was not allowed to have carpal tunnel braces. (Id.) Hampton therefore wanted to have this equipment verified or approved. (Id.)

4

Koltay wrote an order with an instruction to "confirm [that] carpal tunnel braces are included in patient's equipment list."  (Doc. 41 ¶ 12).

Defendant Koltay next saw Hampton on January 21, 2014, for complaints of pain due to carpal tunnel syndrome.  (Doc. 41 ¶ 13; Doc. 42-1 at 22; Doc. 44 ¶ 13).  Hampton stated that he recently started a new job involving repetitive movement.  (Id.)  He further stated that he was never issued carpal tunnel braces.  (Id.)  Hampton reported bilateral pain that was greater in his dominant right wrist.  (Id.)  Koltay noted no recent complaints of carpal tunnel syndrome and ordered a trial of wrist splints.  (Id.)  Koltay also updated Hampton's medical restrictions to reflect that Hampton should avoid activities with repetitive motion.  (Id.)

On February 18, 2014, Hampton was placed in the RHU at SCI-Rockview following an altercation with the Library "Trusty."  (Doc. 41 ¶ 14; Doc. 44 ¶ 14).  Prison staff confiscated Hampton's wrist and back braces when he was transferred to the RHU.  (Id.)

On March 18, 2014, Hampton filed grievance number 504282, wherein he complained that Corrections Officer McHenry confiscated and destroyed his personal property, i.e., his braces, and failed to provide him with a notice of confiscation ("CIR") for his back and wrist braces.  (Doc. 41 ¶ 15; Doc. 44 ¶ 15).

On May 8, 2014, Hampton reported to defendant Koltay that his medical equipment was confiscated when he was in the RHU.  (Doc. 41 ¶ 16; Doc. 42-1 at 21; Doc. 44 ¶ 16).  Koltay explained that, pursuant to DOC policy, she could not provide him with new braces unless he had a confiscation slip.  (Id.)  Koltay advised

5

Hampton to contact the security office for a confiscated items receipt to obtain replacement braces. (Id.)

On May 19, 2014, Dr. Michael Ekizian wrote a progress note in response to Hampton's request for the return of his back brace. (Doc. 41 ¶ 17; Doc. 44 ¶ 17). Dr. Ekizian did not see Hampton but did review his chart. (Id.) His review indicated complaints of chronic lumbago and degenerative disc disease and that Hampton was taking NSAIDs. (Id.) Dr. Ekizian concluded that Hampton should "continue back brace for now." (Id.) He noted that Hampton's "significant [complaints of] back pain were out of proportion to [the] objective findings." (Id.)

Dr. Ekizian evaluated Hampton on June 3, 2014 for complaints of lumbago. (Doc. 41 ¶ 18; Doc. 44 ¶ 18). Dr. Ekizian noted that Hampton did not want medication and was already using a back brace. (Id.) He observed that previous lumbar spine x-rays revealed only minimal findings of degenerative disc disease and that Hampton reported muscle spasms. (Id.) An examination revealed no abnormal findings, no acute distress, and no problems with ambulation. (Id.) Dr. Ekizian ordered that Hampton first try Tylenol and NSAIDs, noting that there was no recent record of Hampton taking those medications. (Id.) Dr. Ekizian also noted that he would look at Hampton's history for any testing for his prostate specific antigen. (Id.) Dr. Ekizian ordered a new back brace for Hampton, explaining his previous brace was confiscated during his transfer to the RHU. (Id.)

Dr. Ekizian also submitted a consultation request for a physical therapy evaluation. (Doc. 41 ¶¶ 18-19; Doc. 44 ¶¶ 18-19). Therein, Dr. Ekizian explained that Hampton suffered from mild degenerative disc disease of the lumbosacral spine

6

with muscle spasms, was using a back brace for chronic pain, and was directed to take Tylenol as needed. (Id. at ¶ 19).

On June 23, 2014, Hampton was seen by defendant Bernard for complaints of migraines. (Doc. 41 ¶ 20; Doc. 44 ¶ 20). Hampton requested that Bernard specially designate his Tylenol as "keep on person" in lieu of compelling Hampton to go to the pill line. (Id.) Bernard informed Hampton that, because he was on the D mental health roster, he was not permitted to have any medications as "keep on person" with the exception of inhalers. (Id.)

Hampton was seen by Bernard for a refill of his inhalers on July 14, 2014, at which time he inquired about his back brace and wrist splints. (Doc. 41 ¶ 21; Doc. 42-1 at 20; Doc. 44 ¶ 21). Hampton reported that he did not have his braces for a few months, and Bernard observed that Hampton had been without braces since May 2014. (Id.) The parties dispute whether Hampton told Bernard he was able to use a typewriter and write letters. (See id.) Bernard advised Hampton that there was no indication for wrist splints and encouraged him to use Tylenol. (Doc. 41 ¶ 21). She noted that Hampton did not complain of symptoms related to carpal tunnel. (Id.) She also noted that a physical therapy consultation was pending and she would wait for the evaluation before making any determinations regarding a back brace. (Id.) Hampton contends that Bernard discontinued his Tylenol prescription during this visit. (Doc. 44 ¶ 21).

Hampton treated with a physical therapist on July 30, 2014. (Doc. 41 ¶ 22; Doc. 42-1 at 12; Doc. 44 ¶ 22). The physical therapist noted that Hampton experienced right lower back pain that sometimes traveled to the right scapular

7

region. (Id.) Hampton reported suffering from this pain for twelve to thirteen years. (Id.) An examination revealed normal range of motion on all planes, tenderness at the right sacroiliac joint, full strength, and independent ambulation. (Doc. 41 ¶ 22). The parties dispute whether Hampton reported any wrist pain during this visit. (Doc. 41 ¶ 22; Doc. 44 ¶ 22). No recommendation was made for back or wrist braces, and no follow-up was recommended. (Doc. 41 ¶ 22).

On September 22, 2014, defendant Koltay treated Hampton for complaints of bilateral wrist pain and headaches. (Doc. 41 ¶ 23; Doc. 42-1 at 19; Doc. 44 ¶ 23). She noted a history of carpal tunnel syndrome and that Hampton's symptoms were aggravated by recurrent, repetitive motion. (Id.) Hampton reported no relief from non-aspirin medication available at commissary. (Id.) Koltay issued an order for bilateral wrist splits and a trial of Tegretol for pain relief. (Id.) Koltay otherwise continued Hampton's current restrictions and advised him to follow-up as needed. (Id.) Hampton would continue taking Tegretol through June 3, 2015. (Id.)

Hampton again treated with defendant Koltay for complaints of headaches on October 20, 2014. (Doc. 41 ¶ 24; Doc. 44 ¶ 24). He did not report any other pain to Koltay at that time. (Id.) Koltay continued Hampton's Tegretol prescription for pain. (Id.)

In December, 2014, defendant Bernard advised Hampton to treat his headaches with Tylenol, which he could obtain from the commissary. (Id. at ¶ 25; Doc. 42-1 at 17).

On February 24, 2015, Hampton saw PA Hans Reisinger for complaints of headaches. (Doc. 41 ¶ 26; Doc. 42-1 at 18; Doc. 44 ¶ 26). Hampton reported that he

8

was taking Tylenol at one point in time, and it helped relieve his headaches. (Id.) Hampton also reported taking Tegretol his headaches. (Id.) Reisinger added Excedrin PM to his regimen. (Id.)

The parties disagree as to whether Tylenol and Motrin are available for purchase through the commissary. (Doc. 41 ¶ 8; Doc. 44 ¶¶ 8, 25). Hampton states that Tylenol and Motrin are not available for purchase through the commissary. (Doc. 44 ¶¶ 8, 25).

### III. Discussion

Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials. See 42 U.S.C. § 1983. The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Id.; see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).

Hampton's remaining claim against defendants Bernard and Koltay is an Eighth Amendment inadequate medical care claim for discontinuing his

prescription for pain medication. The Eighth Amendment's proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. See Estelle v. Gamble, 429 U.S. 97, 103-05 (1976). In order to establish an Eighth Amendment medical claim, a plaintiff "must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." Natale v. Camden Cty. Correctional Facility, 318 F.3d 575, 582 (3d Cir. 2003) (citing Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)). A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the necessity for a doctor's attention." Monmouth Cty. Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987). In addition, "if unnecessary and wanton infliction of pain results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment." Id. (citation omitted).

A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). A mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment. See Farmer v. Carlson, 685 F. Supp. 1335, 1339 (M.D. Pa.

10

1988); see also McCracken v. Jones, 562 F.2d 22, 24 (10th Cir. 1977); Smart v. Villar, 547 F.2d 112, 113 (10th Cir. 1976), cert. denied, 450 U.S. 1041 (1981).

The Rule 56 record demonstrates that Hampton received ample medical attention from defendants Bernard and Koltay and that they were not deliberately indifferent to his needs.

Hampton claims defendant Bernard discontinued his prescription for pain medication as ordered by a doctor. (Doc. 1 ¶¶ 7-8). When Dr. Ekizian treated Hampton on June 3, 2014, he advised Hampton to "try Tylenol/NSAIDs first", and indicated that there was no previous record of Hampton taking such medications. (Doc. 42-1 at 12, 14, 28; Doc. 45 at 29-30, 57-58). Bernard argues that there is no evidence that Dr. Ekizian wrote a separate order for Tylenol and, thus, no order to discontinue. (Doc. 42 at 4). Hampton concedes that there is no evidence in the prison records of a Tylenol prescription. (Doc. 43-1 at 3, 7). His "theory" is that Bernard removed his Tylenol prescription from the prison system when she purportedly discontinued the medication. (Id.) However, Rule 56 requires more than a "theory" of unsubstantiated allegations. Betts v. New Castle Youth Development Center, 621 F.3d 249, 252 (3d Cir. 2010) (citing Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir.1989)); Podobnik v. U.S. Postal Service, 409 F.3d 584, 598 (3d Cir. 2005) (quoting Celotex, 477 U.S. at 325). Rather, Hampton must come forth with "affirmative evidence" in support of his right to relief. Pappas, 331 F. Supp. 2d at 315; FED. R. CIV. P. 56(e). Hampton fails to meet his burden with respect to his claim that defendant Bernard discontinued a Tylenol prescription.

Quite to the contrary, the evidence establishes that defendant Bernard continually encouraged Hampton to take Tylenol. (Doc. 42-1 at 17, 20). Bernard and Koltay observe that, pursuant to prison policy, all inmates are to purchase over-the-counter medication, such as Tylenol, from the commissary. The relevant policy provides:

> Medical staff will advise inmates when OTC's (over the counter) medications are available in the commissary. If an inmate elects to receive OTC medications during a sick call visit, co-pay fees will apply. An inmate, who is in need of OTC medications that are not available in the commissary, will be addressed as outlined in Subsection B.1. above.

(Doc. 45 at 8); DC-ADM 820, § 2B.2. The policy defines over-the-counter medication as "[m]edications that can be obtained/purchased without a prescription; may be available through the commissary." DC-ADM 820. Hampton was specifically advised: "[a]ny medication that is available over the counter, the inmate is expected to purchase their own. You are not singled out for this process." (Doc. 45 at 83). The record establishes that "non-aspirin x-strength 500mg" (i.e., Tylenol) was available for purchase from the commissary. (Doc. 45 at 28). Hampton acknowledges that he purchased non-aspirin x-strength 500 mg pills from the commissary, and explains that he had to take two to three pills for relief. (Doc. 1 ¶¶ 25-26). The record is devoid of any evidence that Hampton informed Bernard or Koltay that he could not afford to purchase Tylenol. The record is devoid of any facts that would establish that Hampton was without funds for the relevant time period. (Doc. 45 at 97-98). The evidence further reflects that prison policy instructs inmates to establish their inability to afford medication through the Correctional

Health Care Administrator. (Doc. 42-1 at 5; Doc. 45 at 83). Inmates are not to complain about their finances to medical personnel, as medical staff do not have access to inmates' financial account information. (Id.) Thus, Bernard and Koltay did not exhibit deliberate indifference to Hampton's medical needs when they advised him to obtain over-the-counter medication from the commissary in accordance with official prison policy.

Hampton primarily appears to be dissatisfied with the medical care provided by Bernard and Koltay. Hampton is not entitled to convert his dissatisfaction with that care into a constitutional claim. Hampton's personal opinions as to how Tylenol should be provided to inmates amounts to nothing more than a difference of opinion as to a course of treatment. But "mere disagreement as to the proper medical treatment" does not amount to a constitutionally cognizable claim. See Spruill, 372 F.3d at 235 (citing Monmouth Cty., 834 F.2d at 346); see also Norris v. Frame, 585 F.2d 1183, 1186 (3d Cir. 1978) ("Where the plaintiff has received some care, inadequacy or impropriety of the care that was given will not support an Eighth Amendment claim."). The court will grant summary judgment in favor of defendants Bernard and Koltay.

## IV. Conclusion

For the reasons set forth above, the court will grant the motion (Doc. 40) for summary judgment filed on behalf of defendants Bernard and Koltay. An appropriate order will issue.

     /S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated: September 5, 2017